IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

**NORTHWEST ENVIRONMENTAL ADVOCATES,** an Oregon non-profit corporation,

               Plaintiff,

     v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,**

               Defendant.

NO.

**COMPLAINT**

Pursuant to the Administrative Procedure Act, 5 U.S.C. § 702

## NATURE OF THE CASE

1.     This is a civil action brought by plaintiff Northwest Environmental Advocates ("NWEA") challenging actions and inactions of the United States Environmental Protection Agency ("EPA"). The claims concern water pollution clean-up plans known as Total Maximum Daily Loads ("TMDLs") submitted by the State of Washington's Department of Ecology ("Ecology") to EPA for review under the Federal Water Pollution Control Act, more commonly known as the Clean Water Act ("CWA"). Specifically, the claims concern EPA's approval of Washington's submission of a set of temperature TMDLs for the South Fork Nooksack River watershed.

COMPLAINT - 1

**Telegin Law** PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

2.    TMDLs are the means by which the Clean Water Act directs the restoration of waters that violate water quality standards. Restoration of these waters is of critical importance to the nine native Pacific Northwest salmonid species that rely on the South Fork Nooksack for migration spawning, incubation, rearing, and foraging habitats. Of those species, Chinook salmon (*Oncorhynchus tshawytscha*), bull trout (*Salvelinus confluentus*), and steelhead (*Oncorhynchus mykiss*) are federally listed as threatened under the Endangered Species Act ("ESA"). Chinook salmon, in turn, are the primary source of food for the ESA-listed and endangered Southern Resident killer whales, the critical habitat for which includes most of Puget Sound. Washington has determined that 18 percent of the South Fork Nooksack watershed currently exceeds temperatures that are lethal to salmon and, as part of this TMDL, EPA predicts that almost all of the river will have lethal temperatures if no action is taken.

3.    Pursuant to 5 U.S.C. § 702, the right of review provision of the Administrative Procedure Act ("APA"), as well as the citizen suit provision of the ESA, 16 U.S.C. § 1540(g)(1)(A), NWEA now brings this action challenging EPA's actions described herein.

**JURISDICTION AND VENUE**

4.    This court has jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346 (federal defendant), 5 U.S.C. §§ 701–706 (the APA), and 16 U.S.C. §§ 1540(c). An actual, justiciable controversy exists between NWEA and defendant EPA. Judicial review is authorized by 5 U.S.C. § 706 because NWEA and its members have suffered legal wrong and are adversely affected by final agency action within the meaning of the APA.

5.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e), 33 U.S.C. § 1365(a), and LCR 3(e) because a substantial part of the events or omissions giving rise to the claims occurred in Seattle, Washington, where EPA's Region 10 administrative office is located.

COMPLAINT - 2

**Telegin Law** PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

6.    Declaratory relief is appropriate under 5 U.S.C. § 703 and 28 U.S.C. § 2201. Injunctive relief is appropriate under 5 U.S.C. § 703, 28 U.S.C. § 2202, and 16 U.S.C. § 1540(g)(1).

**PARTIES**

7.    The plaintiff in this action is NORTHWEST ENVIRONMENTAL ADVOCATES. Established in 1969, NWEA is a regional non-profit environmental organization incorporated under the laws of Oregon in 1981 and organized under Section 501(c)(3) of the Internal Revenue Code. NWEA's principal place of business is Portland, Oregon. NWEA's mission is to work through advocacy and education to protect and restore water and air quality, wetlands, and wildlife habitat in the Northwest, including Washington. NWEA employs advocacy with administrative agencies, community organizing, strategic partnerships, public record requests, information sharing, expert analysis, lobbying, education, and litigation to ensure better implementation of the laws that protect and restore the natural environment. NWEA has participated in the development of CWA programs in the State of Washington for many years, including the state's TMDL program by, *inter alia*, having brought suit in 1991, and again in 2019, against EPA for its failure to establish TMDLs for the State of Washington and serving on EPA's TMDL federal advisory committee from 1996 to 1998.

8.    NWEA's members regularly use and enjoy the waters of the South Fork Nooksack River and adjacent lands and have definite future plans to continue using them for recreational, scientific, aesthetic, spiritual, conservation, educational, employment, and other purposes. Many of these interests revolve around viewing sensitive salmonid species and other aquatic and aquatic-dependent species, such as birds and mammals, that are under threat by pollution in the waters at issue in this lawsuit. The use and enjoyment that NWEA's members derive from

COMPLAINT - 3

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

viewing these species, and otherwise recreating on or near and enjoying the waters of the South Fork Nooksack and its tributaries, is diminished by the effects of pollution, including pollution relating to temperature, dissolved oxygen, pH, nutrients, and fine sediment. NWEA's members would derive more benefits and enjoyment from their use of these waters if these pollutants were not adversely affecting water quality and aquatic and aquatic-dependent wildlife in these waters.

9.      Successful completion of TMDLs to meaningfully address these pollution problems is a critical step in fully implementing the goals of the CWA for these waters, fully protecting salmonids and other aquatic and aquatic-dependent species, and improving water quality. EPA's failure to establish lawful and CWA-compliant TMDLs for the waterbodies at issue in this lawsuit puts these species at risk and threatens or negatively affects the interests of NWEA's members—as does EPA's failure to establish environmentally protective and legally adequate TMDLs.

10.      The recreational, aesthetic, conservation, employment, scientific, educational, spiritual, and other interests of NWEA and its members have been, are being, and unless relief is granted, will continue to be adversely affected and irreparably injured by EPA's failure to comply with the CWA. NWEA's injury-in-fact is fairly traceable to EPA's conduct and would be redressed by the requested relief.

11.      Defendant UNITED STATES ENVIRONMENTAL PROTECTION AGENCY is the federal agency charged with administration of the CWA, and specifically with approving and disapproving TMDLs for the waterbodies at issue in this case under Section 303(d)(2) of the CWA, 33 U.S.C. § 1313(d)(2).

COMPLAINT - 4

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

## LEGAL BACKGROUND

### *The Clean Water Act and Water Quality Standards*

12.     Congress adopted amendments to the CWA in 1972 in an effort "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). The primary goal of the CWA is to eliminate the discharge of pollutants into navigable waters entirely. The Act also established "an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife." *Id.* § 1251(a)(1–2).

13.     To meet these statutory goals, the CWA requires states to develop water quality standards that establish, and then protect, the desired conditions of each waterway within the state's regulatory jurisdiction. 33 U.S.C. § 1313(a). Water quality standards must be sufficient to "protect the public health or welfare, enhance the quality of water, and serve the purposes of [the CWA]." *Id.* § 1313(c)(2)(a). Water quality standards establish the water quality goals for a waterbody. 40 C.F.R. §§ 131.2, 131.10(d).

14.     Under Section 303(c) of the CWA, 33 U.S.C. § 1313(c), EPA is charged with approving or disapproving a state's water quality standards. *See* 33 U.S.C. §§ 1313 (c)(2)(a), (3). Once approved, they become the "applicable" water quality standards for purposes of the CWA. *See* 40 C.F.R. §§ 131.21(c), (d).

15.     Among other purposes, water quality standards serve as the regulatory basis for establishing water quality-based controls over point sources, as required by Sections 301 and 306 of the CWA, 33 U.S.C. §§ 1311 & 1316. A point source is a "discernable, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well . . . from which pollutants are or may be discharged." 33 U.S.C. § 1362(14). Point source discharges are regulated under National Pollutant Discharge Elimination System ("NPDES") permits that

COMPLAINT - 5

require point sources to meet both technology-based effluent limitations and "any more stringent limitation . . . necessary to meet water quality standards." 33 U.S.C. § 1311(b)(1)(C). Water quality standards are thus integral to the regulation of point source pollution.

16.     Water quality standards also are used to establish measures to control nonpoint source pollution. Unlike point source pollution, nonpoint source pollution is generally considered to be any pollution that cannot be traced to a single discrete conveyance. Examples include runoff from agricultural or forestry lands and increased solar radiation caused by the loss of riparian vegetation.  Congress did not establish a federal permitting scheme for nonpoint sources of pollution. Instead, Congress assigned states the task of implementing water quality standards for nonpoint sources, with oversight, guidance, and funding from EPA. *See, e.g.*, 33 U.S.C. §§ 1288, 1313, 1329. Even so, water quality standards apply to all pollution sources, point and nonpoint alike. "[S]tates are required to set water quality standards for *all* waters within their boundaries regardless of the sources of the pollution entering waters." *Pronsolino v. Nastri*, 291 F.3d 1123, 1127 (9th Cir. 2002) (emphasis in original).

### *Total Maximum Daily Loads*

17.     In addition to serving as the regulatory basis for NPDES permits and non-point source controls, water quality standards are the benchmarks by which the quality of a waterbody is measured. In particular, water bodies that do not meet applicable water quality standards, or cannot meet applicable standards after the imposition of technology-based effluent limitations on point sources, are deemed to be "water quality limited" or "impaired" and placed on a list of such waters compiled under Section 303(d)(1)(a) of the CWA (known colloquially as the "303(d) list"). *See* 33 U.S.C. § 1313(d)(1)(A); 40 C.F.R. § 130.2(j). States must then develop TMDLs for

COMPLAINT - 6

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

all 303(d)-listed waters in order to establish the scientific basis for cleaning up water pollution that violates water quality standards.

18.     A TMDL is the total daily loading of pollutants for a particular waterbody or waterbody segment. *See* 40 C.F.R. §130.2(i). A TMDL "shall be established at a level necessary to implement the applicable water quality standards with seasonal variation and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C). The total amount of pollutants that may enter a waterbody while still meeting water quality standards is called its "loading capacity." 40 C.F.R. § 130.2(f). TMDLs for individual water bodies or segments are often bundled together by basin, subbasin, or watershed in the same analytical document.

19.     TMDLs must be set at levels necessary to attain EPA-approved, *i.e.* "applicable," water quality standards. *Id. See also* 40 C.F.R. § 131.21(c), (d). Thus, EPA cannot approve a TMDL based on water quality standards that EPA has yet to review and approve under Section 303(c) of the CWA, 33 U.S.C. § 1313(c). *Id. See also* 33 U.S.C. § 1313(d)(1)(C).

20.     Further, while a waterbody is deemed to be water quality-limited or impaired if it will violate "*any* water quality standard," 33 U.S.C. § 1313(d)(1)(A) (emphasis added), TMDLs for the waterbody must be set at a level necessary to attain all "*applicable* water quality standards," 33 U.S.C. § 1313(d)(1)(C) (emphasis added). As a consequence, once a state determines that a waterbody will not or cannot meet any single water quality standard after the imposition of technologically-based effluent limitations on point sources, the state must design each subsequent TMDL to meet all water quality standards that apply to the impaired waterbody and which are affected by the parameter or pollutant addressed by the TMDL.

COMPLAINT - 7

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

21.    After calculating a waterbody's loading capacity, a TMDL then distributes portions of the total loading capacity to individual sources of pollution or sectors of pollution sources. These allocations include both "wasteload allocations" and "load allocations," for point and nonpoint sources of pollution respectively. 40 C.F.R. § 130.2(i). A wasteload allocation is "[t]he portion of a receiving water's loading capacity that is allocated to one of its existing or future point sources of pollution." *Id*. at § 130.20(h). A load allocation is "[t]he portion of a receiving water's loading capacity that is attributed either to one of its existing or future nonpoint sources of pollution or to natural background sources." *Id*. at § 130.20(f). In essence, the purpose of load and wasteload allocations is to allocate the total amount of pollution that may enter a waterbody between all the sources of pollution, including both point and nonpoint sources of pollution, thereby restricting pollution inputs from all sources sufficiently to attain and maintain water quality standards.

22.    EPA requires that TMDLs demonstrate a reasonable assurance that nonpoint source reductions to meet load allocations are expected to occur, where both point and nonpoint sources contribute to the impairment, based on the congruent requirements of CWA sections 303(d)(1)(C) and 301(b)(1)(C). *See, e.g.,* 40 C.F.R. § 130.2 (defining TMDL: "If BMPs or other nonpoint source pollution controls make more stringent load allocations practicable, then wasteload allocations can be made less stringent. Thus, the TMDL process provides the nonpoint source control tradeoffs."). Under CWA Section 303(d)(1)(C), a TMDL must be "established at a level necessary to implement the applicable water quality standards[.]" 33 U.S.C. § 1313(d)(1)(c); *see also* 40 C.F.R. 130.7(c)(1). In turn, CWA Section 301(b)(1)(C) requires that point source permits have effluent limits as stringent as necessary to meet water quality standards. *See also* 40 C.F.R. § 122.44(d). In the absence of reasonable assurances that load

COMPLAINT - 8

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

allocations to nonpoint sources will be met, TMDL wasteload allocations cannot serve as the basis for sufficient effluent limits in NPDES permits, such that applicable standards will be attained.

23.     As with water quality standards, states must submit TMDLs to EPA for approval or disapproval under Section 303(d) of the CWA. *See* 33 U.S.C. § 1313(d)(2). Section 303(d) requires that within 30 days after submission EPA either approve the TMDLs or disapprove them. *Id*. If EPA disapproves a state-submitted TMDL, it must then establish a replacement TMDL within 30 days. *Id*.

24.     Upon EPA approval or promulgation of a TMDL, all future NPDES permits must be consistent with the EPA-approved TMDL's wasteload allocations for point sources. 40 C.F.R. § 130.2(h); *id*. § 122.44(d)(1)(vii)(B). The approved load allocations serve as the basis for federal, state, and local programs for controlling nonpoint source pollution, including state programs that receive federal funds under Section 319 of the CWA, 33 U.S.C. § 1329. Once EPA approves a TMDL, the state must also incorporate the TMDL into its "continuing planning process" under Section 303(e) of the CWA. 33 U.S.C. § 1313(e)(3)(C).

### *The Administrative Procedure Act*

25.     Section 702 of the Administrative Procedure Act, 5 U.S.C. §702, provides a private cause of action to any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." Under Section 706 of the APA, 5 U.S.C. § 706(2)(A), a court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

COMPLAINT - 9

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

**FACTUAL BACKGROUND**

26.    Washington's South Fork Nooksack River begins in the Twin Sisters mountain range and flows to the mainstem Nooksack River, which flows through Nooksack Indian Tribe trust lands and through the Lummi Nation Reservation before discharging into Bellingham Bay, Puget Sound. The South Fork Nooksack River and its tributaries are protected, *inter alia*, by Washington water quality standards for temperature, intended to protect sensitive aquatic life uses such as rearing, migration, and spawning of salmon, steelhead, trout, and other aquatic life uses. These fish species are highly valued by the many state residents that depend on them for subsistence, cultural, recreational, or economic reasons. The Lummi Nation and Nooksack Indian Tribe rely on salmon in the Nooksack River watershed for ceremonial, subsistence, and commercial purposes.

*27.*    Exceedances of temperature criteria harm important fish populations that depend on the South Fork Nooksack River watershed for survival. Winter steelhead, coho, early and late-timed Chinook, pink, sockeye, and chum salmon use these waters for spawning, rearing, migration, and holding. Steelhead, coho, some Chinook, and sockeye juveniles also rear in these waters year-round. According to the TMDL, Washington "gave a very high priority to the South Fork of the Nooksack River because of the spring Chinook salmon run that it supports. This run is one of the most stressed of the Chinook salmon in the Evolutionarily Significant Units ("ESU") protected by the Endangered Species Act in the designation of essential habitat." Washington Department of Ecology, *South Fork Nooksack River Temperature Total Maximum Daily Load Water Quality Improvement Report and Implementation Plan* (February 2020) (hereinafter "South Fork Nooksack TMDL") at xiv. Temperature exceedances result in a failure to attain the

COMPLAINT - 10

**Telegin Law PLLC**
216 6th Street
Bremerton, WA 98337
(206) 453-2884

CWA's goal of achieving water quality that provides for protection and propagation of fish, shellfish, and wildlife, and recreation in and on the water.

28.    For example, excess temperature can lead to depressed survival rates among salmonids due to adverse physiological and behavioral changes such as increased metabolic rates, reduced swimming performance, impairment of predator avoidance, increased incidence of disease, and death. Temperature often has a synergistic or additive effect by increasing the toxicity and adverse impact of other pollutants. Temperature also contributes to lower levels of dissolved oxygen in streams. (Notably, tributaries to and portions of the South Fork Nooksack River that are impaired for dissolved oxygen that are not covered by this TMDL.) For all of these reasons, achieving Washington's water quality standards for these parameters is a critical component of the CWA's goal of achieving water quality that allows for human recreation and provides for the protection and propagation of fish, shellfish, and wildlife. *See* 33 U.S.C. § 1251.

29.    Current conditions in the South Fork Nooksack not only exceed the EPA-approved biologically-based numeric criteria established for the protection of cold-water salmonid species, but exceed lethal temperatures, as the TMDL demonstrates in the figure below (the dashed red line represents a seven-day moving average lethal temperature of 22° C, the solid red line represents a one-day lethal temperature of 23° C, and the dashed dark purple line is predicted critical conditions of low flow and high air temperature). This graph is not hypothetical; as the TMDL states: "[temperatures] in the summer of 2009[] were close to critical conditions (coincident 7Q10 flow and 90th percentile temperature), and maximum stream temperatures approached or exceeded these benchmarks at several stations." South Fork Nooksack TMDL at 124.

COMPLAINT - 11

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884



**Figure 63. Predicted maximum water temperatures for critical low-flow (7Q10) and meteorological (90 percentile) conditions for current and 100-year system potential scenarios along the mainstem of the South Fork Nooksack River.**

30.     An example of the impacts of temperature on threatened Chinook in the South Fork Nooksack River occurred in 2021 in which at least 2,500 adult Chinook—83 percent of the 2020 run—died before spawning over a few days in early September due to high stream temperatures resulting in the proliferation of the fish pathogen *Columnaris*, according to the Lummi Nation. *See* Lummi National Resources Department, *2021 South Fork Nooksack River Chinook Mortality Event Overview and Conclusions* (October 7, 2021). In its report on this pre-spawning mortality event, the Lummi Nation demonstrated the consistently high temperatures at the Saxon gauge (USGS No. 12210000), located at Saxon Bridge, downstream of the confluence of Skookum Creek with the South Fork Nooksack River.

COMPLAINT - 12



The Lummi Nation report also illustrated this pre-spawning mortality event with the following photograph.



31.    In the following year, 2022, several hundred Chinook died prior to spawning from the combination of high temperatures and disease.

COMPLAINT - 13

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

32.     Since at least 1996, some portions of the South Fork Nooksack River at issue in this lawsuit were placed on Washington's 303(d) list of impaired waters for temperature impairment.

33.     By 2012, Ecology and EPA had begun work on TMDLs to address these impairments. The primary cause of human impacts to stream temperatures stem from decreased riparian vegetation due to logging, farming, and development. These human activities also decrease groundwater inflows and increase sedimentation that changes channel morphology that, in turn, increases warming. The predominant land use in the watershed is commercial forestry, with the lower portion in irrigated agriculture and development. The TMDL includes one wasteload allocation to a point source regulated through the CWA's NPDES program: the Skookum Creek Fish Hatchery, operated by the Lummi Nation as a restoration program.

34.     In 2020, Ecology completed the South Fork Nooksack TMDLs that include 20 303(d) listed segments of the mainstem river and identified tributaries. However, the TMDL also explicitly recognizes that addressing the 303(d) listed segments alone cannot bring them into compliance with the water quality standards and, for this reason, it clearly establishes that it is the entire South Fork Nooksack watershed that is subject to the TMDL's limits on nonpoint sources. We refer to these 20 waterbody segment TMDLs and Ecology's load allocations to the entire watershed here as "the South Fork Nooksack TMDL."

35.     The South Fork Nooksack TMDL incorporated the results of an EPA pilot research project "to consider how projected climate change impacts can be incorporated into the TMDL and influence implementation plans[.]" South Fork Nooksack TMDL at xx. EPA commissioned three technical reports to support this effort: (1) J.B. Butcher, et al., *Quantitative Assessment of Temperature Sensitivity of the South Fork Nooksack River Nooksack River under*

COMPLAINT - 14

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

*Future Climates using QUAL2Kw,* EPA/600/R-14/233 (2016); (2) EPA, *Qualititative Assessment: Evaluating the Impacts of Climate Change on Endangered Species Act Recovery Actions for the South Fork Nooksack River, WA,* EPA/600/R-16/153 (2016); and (3) EPA, *EPA Region 10 Climate Change and TMDL Pilot – South Fork Nooksack River, Washington, Final Project Report*, EPA/600/R-17/281 (Sept. 2017).

36.     The results of the Quantitative Assessment suggested that:

> without restoration of riparian shade, maximum water temperatures during critical summer low-flow conditions could increase by almost 6° C by the 2080s. Restoration of full system potential riparian shading at 100 years can help buffer against temperature increases. However, even with system potential shade, the critical condition maximum 7-day average stream water temperatures are expected to increase by 1.1 to 3.6° C by the 2080s. In conjunction with this increase, the percent of stream miles in which critical condition water temperatures exceed levels identified as potentially lethal to salmon is predicted by the model simulations to increase dramatically—from about 18% at present to between 60% and 90% in the 2080s.

*Id*. at 176.

37.     In addition to EPA's involvement, the Nooksack Indian Tribe also contributed data and information to the development of the TMDL. For example, in 2000, the Tribe contracted for an assessment of the riparian condition of portions of the watershed, as shown in the following map from the TMDL showing a low level of riparian shading (e.g., red and orange).

COMPLAINT - 15

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884



Figure 24. Subset of assessment units from riparian function assessment (based on 1991 and 1995 aerial imagery).

*Id*. at 48, fig. 24.

38.    A wide array of other data sources were used in developing the TMDL. For example, LiDAR data collected by airplanes demonstrates the vegetation heights along the South Fork Nooksack River in the TMDL, showing a predominance of low height riparian vegetation (orange and red shading):

COMPLAINT - 16

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884



**Figure 25. Existing vegetation height along the South Fork Nooksack River from LiDAR data collected in 2005 and 2009**

*Id*. at 49, fig. 25.

39.     The South Fork Nooksack TMDL addresses or purports to address one of the largest source of heat throught the watershed, namely direct solar radiation to the mainstem, its tributaries, and all upstream watershed areas. While establishing the heat load in Watts/m$^2$, the TMDL also uses the more usable surrogate measure of effective shade. Load allocations to nonpoint sources are established in 1,000 meter increments for the mainstem river (beginning at its confluence with Wanlick Creek) as shade deficits that range from 4.0 to 32.0 percent of purported natural shade conditions. These are demonstrated on a map shown in the figure below and set out in the TMDL's Appendix C as a table.

COMPLAINT - 17

Telegin Law **PLLC**
216 6th Street
Bremerton, WA 98337
(206) 453-2884



**Figure 71. Effective shade deficit by 1,000-m increments.**

The deficit represents the difference in effective shade between system potential and current vegetation conditions, as estimated by the Shade model.

*Id*. at 140, fig. 71.

40.    Load allocations to tributaries throughout the watershed are based on achieving System Potential Vegetation ("SPV") based on a stream's bankfull width, demonstrated on a shade curve, *see* South Fork Nooksack TMDL at 141, fig. 72, and set out in the TMDL's Appendix D. The TMDL also establishes load allocations "based on full SPV" for the supplemental spawning period in which the 13° C criterion applies. *Id*. at 136.

41.    By letter dated May 6, 2020, EPA approved the South Fork Nooksack TMDL, finding that "these allocations have been established at levels that, when fully implemented, will lead to the attainment of applicable water quality standards." EPA's approval was arbitrary and capricious for a number of reasons.

42.    First, in establishing temperature thresholds for waterbodies within the South Fork Nooksack watershed upon which the elements of the TMDL are based (including loading

COMPLAINT - 18

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

capacity, load and wasteload allocations, and margins of safety), the TMDL deviates from Washington's formally adopted, EPA-approved biologically-based numeric temperature criteria for fish and other aquatic life. These numeric criteria include a 16° C criterion for core summer salmonid habitat, spawning, rearing, and migration. WAC 173-201A-200, Table 200(1)(c). In addition, a char spawning and rearing criterion of 12° C, *id*., and a 13° C supplemental salmonid spawning and incubation criteria apply September 1 to July 1, WAC 173-201A-200 (1)(c)(B)(iv). Washington's standards allow for an additional increment of human use warming above these numeric criteria of 0.3° C. *See* WAC 173-201A-200(1)(c)(i). Instead of aiming to meet these numeric criteria, the South Fork Nooksack TMDL relies on Washington's so-called "natural conditions" provision at WAC 173-201A-260(1)(a), now disapproved by EPA, which the TMDL describes working in the following manner: "When a water body does not meet its assigned criteria due to natural climatic or landscape attributes, the standards state that the natural conditions constitute the water quality criteria[.]" This provision also allowed for a 0.3° C human use allowance over the natural conditions. As EPA determined in its approval memorandum, "the natural conditions constitute the water quality criteria" "using the estimated natural temperature condition as the TMDL target." EPA, Memorandum from Laurie Mann and Ashley Zanolli, to Administrative File for the South Fork Nooksack Temperature Total Maximum Daily Load, Re: *U.S. EPA Review of the SF Nooksack River Temperature Total Maximum Daily Load* (May 5, 2020) (hereinafter "EPA Approval Memo") at 6.

43.     Using this natural conditions provision, the TMDL attempts to change the applicable temperature criteria without EPA's having first reviewed and approved the new criteria to determine if they comply with Section 303(c) of the CWA, 33 U.S.C. § 1313(c), and the CWA's implementing regulations. *See, e.g.,* 40 C.F.R. § 131.11(a) (Criteria "must be based

COMPLAINT - 19

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

on sound scientific rational and must contain sufficient parameters or constistuents to protect the designated use." Criteria must also "support the *most sensitive* use." *Id*. (emphasis added). Thus, the South Fork Nooksack TMDL was not calculated to attain "applicable standards" as required by Section 303(d)(1)(C) of the CWA, 33 U.S.C. § 1313(d)(1)(C).

44.     EPA did not review the new supplanting temperature criteria established pursuant to the state's natural conditions provision in the South Fork Nooksack TMDL to determine if they will protect salmon, steelhead, and other aquatic life designated uses and to assess that they accurately represent natural conditions. This is despite the fact that at least some of the new criteria are within the lethal range for those species. In this way, too, in approving the TMDL, EPA failed to determine whether the South Fork Nooksack TMDL is calculated to attain all applicable standards.

45.     Second, the TMDL does not demonstrate that it will meet applicable biologically-based numeric criteria. The TMDL cites the natural conditions criterion to choose superseding, warmer temperatures, based on its computer model of the mainsteam river. While the TMDL also asserts that this is merely the "TMDL target," and that adopting this target will only take place as a formal rule change to adopt site-specific criteria under a separate provision of Washington's water quality standards, WAC 173-201A-430 (allowing for the adoption of site-specific criteria) "only after significant implementation has occurred," the South Fork Nooksack TMDL does not contain any analysis that shows its loading capacity and load allocations will meet the applicable numeric criteria.

46.     In calculating the purported "natural condition" that automatically became the criteria to meet based on the natural condition criteria, WAC 173-201A-260(1)(a), when EPA approved the TMDL, the South Fork Nooksack TMDL chose superseding warmer temperatures

COMPLAINT - 20

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

that do not represent natural conditions. As described by the TMDL, after Washington calibrates a river model, the calibrated model is used to evaluate different scenarios, "including a 'system thermal potential' or 'system potential' scenario that represents the natural condition of the river system." The TMDL describes "system potential temperature" as

> [a]n approximation of the temperatures that would occur under natural conditions. System potential is our best understanding of natural conditions that can be supported by available analytical methods. The simulation of the system potential condition uses best estimates of mature riparian vegetation, system potential channel morphology, and system potential riparian microclimate that would occur absent any human alteration.

South Fork Nooksack TMDL at A-196.

47.     In order to generate the purported natural conditions, after calibrating its river model, Ecology removed point source discharges and increased the riparian shade to represent a more natural forest. The shade cast by this purported natural forest was simulated with tree heights based on native vegetation at 100 years of age, namely 50.66 meters or 166.2 feet. The shade impacts of a natural forest were also simulated by assuming that a riparian buffer width of no more than 150 feet would produce the maximum shade possible and, thus, the lowest possible natural temperatures found in natural conditions. Finally, a vegetative density of 85 percent was chosen to represent natural conditions. These conditions were determined to be System Potential Shade.

48.     In running a purported natural scenario for the mainstem river, Washington used as inputs existing tributary temperatures if they were cooler than applicable numeric criteria or the applicable numeric criteria if existing temperatures were higher. The microclimate effect of cooled air temperatures as a result of mature riparian vegetation was also plugged into the model based on a study that showed buffer widths of at least 150 feet could decrease mean daily air temperatures by 2° C. Stream flows from tributaries, headwaters, and groundwater were

COMPLAINT - 21

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

established to represent natural low or critically-low flows. The TMDL then chose Scenario 5 to represent the coolest natural conditions produced by the model inputs, as shown in the following graph (the bottom solid orange line obscured by green dashes).



Figure 63. Predicted maximum water temperatures for critical low-flow (7Q10) and meteorological (90 percentile) conditions for current and 100-year system potential scenarios along the mainstem of the South Fork Nooksack River.

*Id.* at 123, fig. 63.

49.     Third, EPA's approval of the South Fork Nooksack TMDL, including its choice of Scenario 5, did not include superseding *natural* temperatures as required by the now-disapproved WAC 173-201A-260(1)(a), but, rather, temperatures that include anthropogenic influences. In response to a request by the Nooksack Indian Tribe, Ecology ran additional estimated natural conditions based on four changes: (1) 20 percent cooler headwater and tributary temperatures to represent the potential effect of no forestry activities in the upland areas of the watershed; (2)

COMPLAINT - 22

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

decreased channel width using 1890 land survey data to reflect a reverse of a pattern of historic channel widening; (3) increased effective shade due to increased vegetation height of 290 feet (rather than 166.2 feet) based on estimated natural/old-growth/climax conditions and an associated increased riparian buffer width to 218-foot buffer representing 75 percent of the new vegetation height (rather than 150 feet); and (4) enhanced hyporheic exchange (between cooler groundwater and surface water).

50.     The TMDL concluded that "[t]he largest effect was seen from increased vegetation height and wider buffers." The results of an increase in effective shade are illustrated with a graph (blue line indicates increase in effective shade from taller trees and wider riparian buffer as compared to the black line that was used in calculating Scenario 5).



**Figure 65. Comparison of Shade Model effective shade results for the August critical condition and a scenario with increased buffer and vegetation height.**

South Fork Nooksack TMDL at 128, fig. 65.

COMPLAINT - 23

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

51.    An illustration of the upland disturbance affecting stream temperatures identified by the Nooksack Indian Tribe is shown from an image from Google Maps for the impaired Howard Creek, a tributary of the South Fork Nooksack River included in the TMDL.



52.    The TMDL set out the model results of each of these four cooling changes and their results combined, as shown in the table below.

Table 33. Estimated maximum stream temperatures along the mainstem for natural condition variation model runs.

| Condition | Average Maximum Stream Temperature (°C) | | |
|---|---|---|---|
| | All Reaches | Headwaters to Reach 28 (WQS Change[10]) | Reach 28 to Outlet |
| TMDL Scenario 5 -7Q10 Critical conditions | 18.7 | 17.8 | 19.6 |
| Cooler headwater and tributaries | 18.0 (- 0.7) | 16.9 (-0.9) | 19.0 (-0.6) |
| Decreased Channel Width | 18.1 (-0.6) | 17.2 (-0.6) | 18.9 (-0.7) |
| Increased SPV height and buffer width | 17.5 (-1.2) | 16.7 (-1.1) | 18.2 (-1.4) |
| Enhanced hyporheic exchange | 18.6 (-0.1) | 17.8 (-0.0) | 19.3 (-0.3) |

| Condition | Average Maximum Stream Temperature (°C) | | |
|---|---|---|---|
| | All Reaches | Headwaters to Reach 28 (WQS Change[10]) | Reach 28 to Outlet |
| Combined natural condition variations | 15.8 (-2.9) | 15.1 (-2.7) | 16.4 (-3.2) |

COMPLAINT - 24

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

South Fork Nooksack TMDL at 129–130, tbl. 33.

53.     The TMDL also set out this information in graph form, as depicted below. The darker green line represents the TMDL's choice of Scenario 5 and the lighter green line ("Trial 5") represents the cooler predicted natural temperatures based on the four changes combined. The TMDL concluded that "[c]ombining all scenarios results in meeting numeric water quality criteria in portions of the river." *Id.* at 149. This statement describes where the lighter green line dips below the blue lines that represent the applicable numeric criteria.



Figure 66. Comparison of temperature model results for TMDL Scenario 5 and a combination of natural condition scenarios.

*Id.* at 130, fig. 66.

54.     The overall reduction in predicted natural temperature for all reaches using a historic climax tree height and 216-foot buffer is a temperature lower than the chosen Scenario 5 by –1.2° C. Combined, the four cooling changes result in an overall reduction of a predicted natural temperature for all reaches of –2.9° C.

COMPLAINT - 25

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

55.     Having used its model to demonstrate that natural temperatures in the South Fork Nooksack would have been significantly cooler than those generated by Scenario 5 chosen as representing natural temperatures in the TMDL, the TMDL then did not use those cooler temperatures. Instead, Ecology wrote in response to its findings: "The extent to which the larger tree heights are applicable should be verified as part of implementation, and Load Allocations should be adjusted to include taller trees and wider buffers where applicable as an adjusted estimate of natural conditions." *Id*. at 128.

56.     Fourth, the South Fork Nooksack TMDL lacks reasonable assurance that even the warmer superseding computer-derived "natural temperatures" in Scenario 5 will be achieved, let alone the applicable numeric criteria. While the model scenario that Washington used to establish the natural condition targets was based on achieving 150 feet of mature forested riparian buffers for shade on either side, the TMDL itself only calls for implementation of existing state forest practices rules because, Washington claims, those rules "were developed with the assumption that the stream buffers and harvest management prescriptions were stringent enough to meet state water quality standards for temperature and turbidity, and provide protection equal to what would be required under a TMDL." *Id*. at 154. Even so, the South Fork Nooksack TMDL acknowledges that Ecology did not at the time it completed the TMDL believe that the state logging practices were sufficient to meet water quality standards. *See* TMDL at 154. Specifically, Ecology relied on its 2009 review of efforts to understand if the logging practices are sufficient to meet water quality standards based on studies by Washington's Cooperative Monitoring Evaluation & Research Committee ("CMER"). In that 2009 review, the agency wrote "Ecology contends that the prescriptions associated with the Type Np [non fish-bearing perennial stream] rules have the greatest potential risk of violating the water quality standards." Ecology, *2009 Clean Water Act*

COMPLAINT - 26

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

*Assurances Review of Washington's Forest Practices Program: Examining the effectiveness of Washington's forest practices program in bringing waters into compliance with state water quality standards and the federal Clean Water Act* (July 15, 2009) (hereinafter "2009 Review") at 12. The following map from the TMDL shows the extensive extent of non-fish bearing streams ("Class N" streams in blue) in the South Fork Nooksack watershed.



Figure 74. Comparison of Shade Deficit to Habitat Conservation Areas (subject to protected buffers – variable by county).

South Fork Nooksack TMDL at 158.

57.     Neither Ecology in its TMDL nor EPA in its approval evaluated whether using existing logging practices at WAC 222, deemed to be sufficient to meet the TMDL's loading capacity and load allocations, could or would meet the load allocations in the South Fork Nooksack TMDL that were established on the basis of modeling 150-foot riparian buffers. These state logging practices include, for fish-bearing waters (Types "S" and "F"), a requirement for 50-foot no-cut buffers, WAC 222-30-021(1)(a), with a 75-foot prohibition on cutting any single

COMPLAINT - 27

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

tree if its shade is necessary to meet water quality standards, WAC 222-30-040(2).  And, for non-fish-bearing waters, Type "Np" perennial streams require a 50-foot no-cut buffer along a portion of their length, WAC 222-30-021(2)(b), and Type "Ns" seasonal streams have no protections.

58.    Likewise, the TMDL did not demonstrate reasonable assurance that practices and programs for agricultural areas would meet the load allocations. Instead, the TMDL explicitly notes that the "provisions for agriculture in the [Critical Area] code[s] do not provide further restoration of critical areas," but merely "protection of existing riparian vegetation[.]" South Fork Nooksack TMDL at 159.

59.    The TMDL did not evaluate whether the calculated load allocations as modified by Ecology's choice of existing state logging rules to implement those load allocations would meet the loading capacity and applicable water quality standards.

60.    Fifth, EPA's approval ignored that the South Fork Nooksack TMDL did not assess whether the riparian buffers established by the state logging practices at WAC 222, which Ecology deemed sufficient to meet the effective shade loading capacity and load allocations, would achieve the other three essential factors for achieving the superseding temperature criteria established in the TMDL. The factors included in the model run that produced Scenario 5 purportedly natural temperatures, in addition to effective shade, are the following: (1) tributaries and headwaters at or below the applicable numeric water quality criteria; (2) microclimate effects of reduced air temperature associated with 150-foot buffers; and (3) critical low flows. *See, e.g.*, *id.* at 138. Neither the TMDL nor EPA's approval conducted this evaluation.

61.    Sixth, neither Ecology in the TMDL nor EPA in its approval evaluated the effect of forest stand age on late summer streamflows and stream temperatures in calculating the purportedly natural supplanting criteria. *See, e.g.* TMDL at 125. In its comments, the Nooksack

COMPLAINT - 28

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

Indian Tribe noted that logging changes run-off patterns, resulting in lowered late-summer and early-fall flows—a time that is most critical for the South Fork Nooksack spring Chinook salmon. The Tribe commented: "Perry and Jones (2016) [Perry, T.D., & J.A. Jones, *Summer streamflow deficits from regenerating Douglas-fir forest in the Pacific Northwest, USA*, Ecohydrology 1-13. DOI 10.1002/eco.1790 (2017)] . . . showed through the application of a paired watershed study on the west slope of the Cascade Mountains in Oregon that forest harvest may reduce late season streamflows by up to 50 percent when compared to adjacent watersheds with mature and/or old growth forest stand structure. . . . By ignoring the impacts of forest harvest on river flows and quality results in an incomplete picture of the dynamics of land management and runoff and water quality." South Fork Nooksack TMDL at F-232.

62. Despite Ecology's having run its calibrated model using 20 percent cooler headwater and tributary temperatures that would at least partially represent the potential effect of no forestry activities in the upland areas of the watershed, as requested by the Nooksack Indian Tribe, the TMDL then failed to incorporate its average 0.7° C lowered temperatures in the TMDL loading capacity and load allocations. Instead, Ecology's response was that it was not able to address the effects of forestry on base flows and the resulting effects on temperature because it relies on existing state logging practices at WAC 222. *See id.* at F-235.

63. The South Fork Nooksack TMDL's failure to incorporate appropriate assumptions about upland impacts of commercial logging on critical period stream flows is inconsistent with the requirement that a TMDL be established with seasonal variations and that takes into account critical conditions for stream flow. 40 C.F.R. § 130.7(c)(1).

64. Seventh, the South Fork Nooksack TMDL does not establish adequate margins of safety as required by CWA section 303(d). In major part, the purported margin of safety consists

COMPLAINT - 29

of various model assumptions used to derive the new criteria in the TMDLs, and that resulted in higher, less protective temperature criteria than would have been allowed based on a more realistic set of assumptions. But setting hotter, less protective criteria is not a margin of safety. Further, while this approach may address how the new supplanting criteria were adopted, it does not shed light on whether they will actually be achieved.

65. By basing Scenario 5 on critical low flows (7Q10—the lowest 7-day average flow that occurs on average once every 10 years), along with the 90th percentile air temperatures of the hottest week for each year of record, and then using these warmest stream temperature results to supplant the biologically-based numeric criteria, the TMDL does not establish an adequate margin of safety. Conservatisms that apply to assessing the allowable level of pollutants have the opposite effect when applied to the establishment of superseding criteria through EPA's approval of the TMDL. Neither Ecology in the TMDL nor EPA in its approval explain how the explicit margin of safety of 0.1° C is rational in this light.

66. In addition, although the TMDL admitted its failure to capture the impacts of the "management of upland processes to restore stream temperatures," "potential changes to the stream channel," and use of 100-year system potential vegetation in lieu of climax vegetation communities, South Fork Nooksack TMDL at 147, the TMDL does not establish an adequate margin of safety because it uses the modeled results to establish superseding criteria warmer than the otherwise applicable numeric criteria.

67. Eighth, after establishing that the tributary temperatures, microclimate effects, and critical low flows were essential to achieving Scenario 5's superseding temperatures, the TMDL established only the single surrogate measure of effective shade. By establishing load allocations based on this single surrogate measure, the TMDL does not include load allocations to reduce the

COMPLAINT - 30

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

human impacts necessary to reduce in-stream temperatures to applicable limits. The TMDL acknowledges that a widened channel from human impacts increases stream temperatures and, as requested by the Nooksack Indian Tribe, calculated an average cooling effect of –0.6° C for a narrowed channel, but it did not include any load allocation to restore widened channels to natural conditions. The TMDL includes the cooling effects of microclimates, which to achieve requires a riparian buffer width of at least 150-feet, but it contains no load allocations that require 150-foot buffers or protection of microclimate effects. Although the South Fork Nooksack TMDL acknowledges that these human alterations have affected stream temperatures in the South Fork Nooksack and its tributaries, neither Ecology nor EPA reviewed whether the single surrogate load allocation of effective shade to determine if it alone was sufficient to attain the applicable water quality standards or even the supplanting natural conditions criteria.

68.     Ninth, after failing to incorporate the average cooling effects of –2.9° C from truly natural conditions, calculated by Ecology in response to a request by the Nooksack Indian Tribe, and acknowledging that these additional anthropogenic warming sources have not been included in the calculation of the Scenario 5 loading capacity, the TMDL still assigns a 0.3° C increase to the loading capacity. Assigning the 0.3° C human use allowance over the purported natural conditions established in the TMDL's choice of Scenario 5 does not ensure that the TMDL will meet water quality standards.

69.     In addition, the TMDL cites EPA-commissioned reports concluding that human-induced climate change could increase the "critical condition maximum 7-day average stream water temperatures" by 1.1 to 3.6° C by the 2080s even with "restoration of full system potential riparian shading." *Id*. at 176. Neither Ecology in the TMDL nor EPA in its approval explain how

COMPLAINT - 31

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

the allocation of 0.1° C to future permitted sources will ensure that water quality standards are met, given that well over 0.3° C of the human use allowance will be used by climate change.

70.    Tenth, the TMDL fails to ensure compliance with downstream water quality standards, as required by WAC 173-201A-260(3)(b). In its approval, EPA incorrectly found that because downstream water quality standards are equivalent or less stringent than the standards used to develop the South Fork Nooksack TMDL, the allocations would achieve downstream standards.

71.    Eleventh, the TMDL also does not provide the required reasonable assurance because it fails to consider and address the climate change impacts that EPA calculated will occur, while recommending postponing action. While calculating and acknowledging the effects of climate change, the TMDL does not even recommend that the logging rules be changed to mirror the 150-foot based analysis set out in Scenario 5 for effective shade and cooling microclimate, instead recommending only voluntary actions. The TMDL does not recommend or require changes in commercial forest harvest rotations to increase base flows, as requested by the Nooksack Indian Tribe, despite the TMDL's finding that reduced summer low flows as a climate impact are almost universally a "high" or "moderate" impact potential, *see* South Fork Nooksack TMDL at 166, table 41, and that "restoring streamflow regimes" is essential, *id*. at 179.

72.    The TMDL does not demonstrate reasonable assurance because it relies on an attenuated (if any) timeframe to respond to any inadequacies in its choice of Scenario 5 for adaptive management. The TMDL acknowledges that "the climate change analysis does suggest the need for maximizing riparian shading beyond [site potential vegetation] assumptions." *Id*. at 178. It urges that "[c]limate change is time dependent. The pace (timing/rate) and priorities of restoration actions for TMDL implementation to ameliorate potential impacts of climate change

COMPLAINT - 32

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

is a key component of an iterative risk management strategy[.]" *Id*. Notwithstanding this statement of urgency, the TMDL retains Scenario 5 and rejects its own finding that taller trees and wider riparian buffers would result in greater cooling: "The extent to which the larger tree heights are applicable should be verified as part of implementation, and Load Allocations should be adjusted to include taller trees and wider buffers where applicable as an adjusted estimate of natural conditions." *Id*. at 128. The TMDL does not say when this adjustment is supposed to take place, given that the site potential tree height is based on 100-year growth and the taller trees (climax vegetation height) is over 100 years. Moreover, no adjustment will be completed by Ecology because the TMDL unequivocally states that the existing state logging practices at WAC 222 are sufficient and recommends no change to them. The TMDL cites Ecology's 2009 review of state logging rules and an adaptive management process that were "in lieu of developing separate TMDL load allocations or implementation requirements for forestry is conditioned on maintaining an effective adaptive management program," *id*. at 154, but that 2009 review found that "[a]fter almost ten years, no CMER studies have been completed that inform whether or not the forest practices rules can be relied on to bring waters into compliance with the state water quality standards and the CWA," 2009 Review at 13. In its approval, EPA cited a 2019 Ecology extension of the reliance on logging practices to December 2021 "to allow time for the Forest Practice Board members to reach an agreement on the revisions to the Type N rules to better protect temperature." EPA Approval Memo at 13. Thus, EPA had no basis upon which to rely that load allocations in this TMDL would be "adjusted."

73. For the reasons above, EPA's approval of the South Fork Nooksack TMDL was arbitrary, capricious, and not in accordance with the law within the meaning of Section 706 of the APA, 5 U.S.C. §706.

COMPLAINT - 33

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

**CLAIM FOR RELIEF**

**Arbitrary and Capricious Partial Approval of the South Fork Nooksack TMDL**

**(Pursuant to 5 U.S.C. § 702)**

74.    NWEA realleges all preceding paragraphs.

75.    As required by Section 303(d)(1)(C) of the CWA, every TMDL "shall be established at a level necessary to implement the applicable water quality standards with seasonal variation and a margin of safety which takes into account any lack of knowledge concerning the relationship between effluent limitations and water quality." 33 U.S.C. § 1313(d)(1)(C). EPA may not lawfully approve a TMDL based on water quality standards that EPA has yet to review under Section 303(c) of the CWA, 33 U.S.C. § 1313(c). *Id. See also* 33 U.S.C. § 313(d)(1)(C). Finally, a TMDL must be calculated to attain all applicable standards that may be affected by the pollutant addressed in the TMDL.

76.    Here, EPA's approval of the South Fork Nooksack TMDL was arbitrary, capricious, and not in accordance with the law. EPA's errors include the following:

A.    EPA did not evaluate whether the approved temperature allocations and loading capacity will attain all applicable, EPA standards.

B.    EPA did not evaluate whether the superseding natural conditions criteria protect the designated beneficial uses of salmon, steelhead, and other aquatic life uses.

C.    The TMDL does not aim to meet the superseding natural conditions criteria it claims are a target.

D.    There is no reasonable assurance in the temperature TMDLs that the actual temperature targets and load allocations established by those TMDLs will be achieved. The TMDL modifies the load allocations by deeming commercial forestry landowners in

COMPLAINT - 34

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

compliance with the TMDL if they comply with existing state logging practices, without evaluating the sufficiency of these practices to meet the allocations or applicable water quality standards.

E.    The TMDL lacks reasonable assurance because it relies upon but did not evaluate whether existing state logging rules would meet the load allocation.

F.    The TMDL ignores logging effects on reducing base flows, ignoring the requirement that a TMDL be established with seasonal variations and that takes into account critical conditions for stream flow.

G.    The TMDL does not establish adequate margins of safety.

H.    The load allocations in the TMDL fail to address, or inadequately address, channel morphology, microclimate, tributary and headwater temperatures, and flow. Relatedly, the temperature allocations are based on only one surrogate—effective shade— when shade alone will not result in the attainment of water quality standards.

I.    The TMDL incorrectly allocates 0.3° C increase in temperature.

J.    The TMDL fails to ensure that downstream water quality standards are met.

K.    There is no reasonable assurance in the TMDL because of climate change.

L.    In all of these ways, EPA's approval of the South Fork Nooksack TMDL was arbitrary, capricious, an abuse of discretion, and not in accordance with the law within the meaning of Section 706 of the APA, 5 U.S.C. §706.

/ / /

/ / /

/ / /

COMPLAINT - 35

Telegin Law PLLC
216 6th Street
Bremerton, WA 98337
(206) 453-2884

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Northwest Environmental Advocates respectfully requests that this Court:

A. Declare that EPA acted arbitrarily and capriciously within the meaning of Section 706 of the APA, 5 U.S.C. § 706(2)(A), in its approval of the South Fork Nooksack TMDL;

B. Vacate and set aside EPA's approval of the South Fork Nooksack TMDL;

C. Award NWEA its reasonable costs and attorneys' fees under 33 U.S.C. §1365(d) and 28 U.S.C. § 2412; and

D. Grant such other relief as the Court deems just and proper.

DATED this 15th day of April, 2026.

Respectfully submitted,

TELEGIN LAW PLLC


By:        s/ Bryan Telegin

Bryan Telegin, WSBA No. 46686
216 6th Street
Bremerton, WA 98337
Telephone: (206) 264-8600
E-mail: telegin@bnd-law.com

*Counsel for Plaintiff Northwest Environmental Advocates*

COMPLAINT - 36